# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT



**COPY FOR YOUR INFORMATION**

FILED
CLERK, U.S. DISTRICT COURT
APR 1 9 1999
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

**OPINION ANNOUNCING
JUDGMENT OF THE COURT**

OPINION FILED AND JUDGMENT ENTERED: 04/13/99

The attached opinion announcing the judgment of the court in your case was filed today. The judgment was entered pursuant to Rule 36. The mandate will be issued in due course.

Information is also provided about petitions for rehearing and suggestions for rehearing in banc. The questions and answers are those frequently asked and answered by the Clerk's Office.

Each side shall bear its own costs.

Exhibits and visual aids shall be promptly retrieved by the party that lodged them with this court.

JAN HORBALY
Clerk

cc:  Margaret K. Pfeiffer
     Karl A. Limbach



ENTERED
CLERK, U.S. DISTRICT COURT
JUL 1 6 1999
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY



FILED
CLERK, U.S. DISTRICT COURT
JUL 1 3 1999
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

RODIME PLC V SEAGATE TECH, 98-1076 , 98-1112,-1204
DCT - 92-CV-6855

___✓___ DOCKETED
_Sent_ MLD COPY PTYS
_____ MLD NOTICE PTYS
___✓___ JS-6

**JUL 1 6 1999**

1100.


DISTRICT JUDGE'S COPY

# United States Court of Appeals for the Federal Circuit

## 98-1076, 98-1112,-1204

### RODIME PLC,

Plaintiff-Appellant,

v.

### SEAGATE TECHNOLOGY, INC.,

Defendant-Cross Appellant.

Margaret K. Pfeiffer, Sullivan & Cromwell, of Washington, DC, argued for plaintiff-appellant.  With her on the brief were Thomas R. Leuba of Washington DC and Robert A. Sacks and Steven W. Thomas, of Los Angeles, California. Also of counsel on the brief were John C. Altmiller and Douglas E. Ringel, Kenyon & Kenyon, of Washington, DC.

Karl A. Limbach, Limbach & Limbach L.L.P., of San Francisco, California, argued for defendant-cross appellant.  With him on the brief were Gerald T. Sekimura, Stephen M. Everett, and Maria S. Cefalu.

Appealed from:  U.S. District Court for the Central District of California

Judge J. Spencer Letts

# United States Court of Appeals for the Federal Circuit

98-1076, 98-1112,-1204

RODIME PLC,

Plaintiff-Appellant,

v.

SEAGATE TECHNOLOGY, INC.,

Defendant-Cross Appellant.

---

DECIDED:  April 13, 1999

---

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and RADER, Circuit Judge.

RADER, Circuit Judge.

In this patent infringement and tort action, Rodime PLC (Rodime) asserted that Seagate Technology, Inc. (Seagate) infringes U.S. Patent No. 4,638,383 (the '383 patent).  Rodime further accused Seagate of tortious interference with prospective economic advantage and unfair competition.  The United States District Court for the Central District of California granted Seagate's motions for summary judgment of noninfringement and for no liability under Rodime's state law causes of action.  Because the district court misconstrued the asserted claims, this court vacates the judgment of noninfringement.  This court also vacates the judgment of no liability under Rodime's state law claims and remands for further proceedings due to disputed issues

of fact relating to the wrongfulness of Seagate's conduct. Finally, this court affirms the district court's grant of Seagate's motion to exclude evidence of Rodime's consequential business damages as irrelevant to the calculation of a reasonable royalty.

I.

The '383 Patent and Accused Device

The '383 patent, entitled "Micro Hard-Disk Drive System," involves computer hard-disk drives. Generally, the patent is directed to the miniaturization of hard drive technology from 5¼ inches to 3½ inches, a size particularly suited for use in portable computers, and problems incident thereto. For example, the patent addresses power consumption, vibration mounting, heat dissipation, storage capacity, and compatibility of the electrical interface with existing technology. See col. 2, l. 34 to col. 3, l. 3.

Disk drives store electromagnetic data on the concentric tracks of disks. While the disks spin at high speed, small electromagnets called "transducers" or "read/write heads" move near the disk surface retrieving and recording electromagnetic information on the concentric tracks. A positioning mechanism supports the heads and moves them to the correct location for data storage or retrieval. To ensure accurate recording and retrieval, the positioning mechanism must place the head precisely and consistently at the correct storage position on a disk track.

The demand for correct positioning introduces another of the numerous problems addressed by the invention of the '383 patent. Variations in temperature can significantly affect the positioning mechanism of the disk drive. Typically, disk drives incorporate stainless steel components where strength is critical and aluminum

components elsewhere to minimize overall weight.  Temperature variations cause these components, constructed of different materials, to expand or contract at different rates as the disk drive heats or cools.

The different expansion rates change the locations of these parts relative to one another.  For example, when the temperature of a disk drive rises during warm-up, the disk itself will expand radially outward from the hub, which causes the tracks on the disk to move in a radially outward direction.  The other components of the disk drive also expand, resulting in a cumulative offset of the head from the track.  Thus, this temperature-induced offset prevents the read/write head from reaching the correct position on the disk track.  Without some compensation for temperature variations, the head will not find the correct track position to retrieve information.

To solve this problem, the '383 patent teaches a thermal compensation scheme. Thermal compensation accounts for different expansion and contraction rates of a disk drive's components.   In the embodiment disclosed in the patent, the thermal compensation system is built into the "positioning mechanism" — the mechanism responsible for moving the heads between tracks.  Specifically, the patent prescribes constructing the positioning mechanism from appropriate materials "to automatically compensate for any mispositioning between the transducer and a track caused by thermal effects."  In addition to using stainless steel and aluminum, some of the components of the positioning mechanism use a third class of materials, such as an aluminum/bronze alloy, for its thermal expansion characteristics.  The components of the positioning mechanism expand by controlled amounts, causing a corrective movement of the transducer to position it at the right location within a track.

Each of the asserted independent claims (3, 5, and 8) recites a "positioning means," the interpretation of which is central to this case. In claim 3, this element reads:

> positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk, said positioning means including:
>
> two support arms each supporting one of said read/write heads with each read/write head being mounted at one end of its respective support arm;
>
> a pivot shaft having an axis located on one side of said support arms and spaced away from said support arms;
>
> a positioning arm to which the other ends of said support arms are attached, said positioning arm having one end thereof coupled to said pivot shaft;
>
> a bearing assembly supporting said pivot shaft for rotational movement thereby enabling said positioning arm to be pivoted about the axis of said pivot shaft;
>
> a stepper motor having an output drive shaft;
>
> means for operating said stepper motor in step increments; and
>
> a tensioned steel band coupling said drive shaft of said stepper motor to the other end of said positioning arm, said band being arranged in a pulley arrangement whereby rotational movement of said stepper motor causes pivoting of said positioning arm about said pivot shaft for moving said support arms and the read/write heads in incremental steps with each increment causing said read/write heads to move from one track to the next adjacent track on said micro hard-disk.

Claims 5 and 8 recite an almost identical "positioning means" to each other, but somewhat different from that of claim 3:

> positioning means for moving said first and second transducer means between the concentrically adjacent tracks on said micro hard-disks, said positioning means including a positioning arm disposed within the sealed housing, a pivot shaft coupled to one end of said positioning arm and supporting said positioning arm for rotational movement relative to said micro hard-disks, four support arms, each supporting one of said heads at one end and each connected to said positioning arm at its other end, a stepper motor having a shaft

> extending into said sealed housing and means for operating said
> stepper motor in step increments, each increment causing said
> read/write heads to move from one track to the next adjacent track
> on said micro hard-disks . . . .

Rodime accuses Seagate's ST157 hard drive of infringing the '383 patent. The parties do not dispute that Seagate's drive incorporates some of the thermal compensation mechanisms disclosed in the '383 patent. Specifically, Seagate's drives use materials with favorable thermal compensation properties in their positioning mechanisms. Seagate's ST157 also relies, however, on a "thermal pin" which works in conjunction with the selection of materials to provide thermal compensation. This pin within Seagate's positioning mechanism has a precise amount of stiffness. When temperature rises and the disk components begin to expand, this expansion stresses the thermal pin causing it to bend. The bending of the pin causes a corrective movement of the head to maintain it at the proper position in the track.

## Rodime's State Law Claims

The '383 patent arose out of Rodime's efforts in the early 1980's to develop a smaller hard drive than the 5¼ inch drives then in use. Rodime succeeded in developing a 3½ inch drive, the RO350, which formed the basis for the specification common to the '383 patent and its parent. By the time the '383 patent issued in 1987, other manufacturers had begun producing 3½ inch drives. Rodime initially met resistance in its efforts to license these manufacturers. Several lawsuits quickly arose in which the manufacturers challenged the validity of the '383 patent. In response, Rodime filed for reexamination so that the United States Patent and Trademark Office (PTO) could determine if the claimed subject matter was patentable over newly discovered prior art. Rodime became aware of this new prior art during its licensing

negotiations and lawsuits. After amending its claims, Rodime secured a Reexamination Certificate on November 29, 1988.

Rodime then renewed its licensing efforts, this time meeting with some success. Having already granted several licenses, Rodime began negotiations with Quantum Corporation and Western Digital Corporation. Seagate, upon learning of these negotiations, contacted both companies to dissuade them from taking licenses from Rodime. In the fall of 1991, Quantum, Western Digital, and Seagate met to discuss the '383 patent and Rodime's licensing offers. Seagate told both companies that if they were sued by Rodime, Seagate would support them by filing a declaratory judgment action. Shortly thereafter, Quantum and Western Digital ended license discussions with Rodime. A similar sequence of events took place the following year with Xebec Ltd., another potential licensee of the '383 patent. Xebec initially expressed an interest in taking a license from Rodime but, after discussions with Seagate, declined to take a license.

Following its discussions with Quantum and Western Digital, Seagate also arranged meetings among hard drive manufacturers to discuss the issue of "form factor patents" — patents whose sole point of novelty is the miniaturization of a known technology (e.g., a patent covering all 3½ inch hard drives). Although Seagate called the meetings ostensibly to discuss an industry-wide concern, Seagate did not invite Rodime to attend. In Rodime's absence, Seagate asserted its belief that Rodime's patents were invalid.

The participants in the form factor meetings also discussed petitioning the government to change its policies regarding form factor patents. Two months before

the first form factor meeting, Norman Talsoe, a one-time employee of Seagate, sent a letter to the Undersecretary for Technology at the Department of Commerce.  The letter discussed the "form factor patent" issue, specifically mentioning Rodime's '383 patent.  Mr. Talsoe, after representing that he had "left Seagate," offered his consulting services to the Undersecretary.  The record shows that Seagate was still paying Mr. Talsoe salary and benefits at the time he wrote this letter.  In fact, Seagate's counsel assisted in the preparation of the letter.

Participants in the form factor meetings also met with PTO officials to discuss the issue.  They suggested changes to the Manual of Patent Examining Procedure to educate the "Examining Corps" about form factor patents.  Seagate suggested that the PTO hire an "independent consultant" to develop an education plan, specifically recommending Mr. Talsoe for the job.  At that time, Seagate still employed Mr. Talsoe as a consultant.

### Procedural History

In November 1992, Rodime filed this action against Seagate in the District Court for the Central District of California asserting infringement of claims 3, 5, 8, and 17 of the '383 patent. Rodime also asserted state law causes of action, including tortious interference with prospective economic advantage, unfair competition, and trade libel, the first two of which are on appeal to this court.

Three district court judges presided over this case:  the late Hon. Richard Gadbois, Jr., followed by the Hon. Kim McLane Wardlaw, and finally the Hon. J. Spencer Letts.  Seagate initially moved for summary judgment of noninfringement before Judge Gadbois who referred the matter to a special master.  The special master

focused his analysis solely on the "positioning means" recited in claims 3, 5, and 8. Rodime argued that this claim element does not fall within the requirements of 35 U.S.C. § 112, ¶ 6 (1994) because it recites sufficient structure to avoid strict functional claiming rules. Rodime further argued that even if the claim element falls under § 112, ¶ 6, it only recites the function of moving the heads from track to track, not the function of performing thermal compensation to position the heads within a particular track. Thus, Rodime continued, the interpreting court need not read the structure corresponding to the thermal compensation function into the claims.

The special master disagreed on both points. He proposed interpreting the disputed claim element as a means-plus-function element because the claim purportedly recited only some of the structural elements underlying the means-plus-function element. He then determined that "the positioning means must include at least some sort of thermal compensation system . . . since the specification defines the positioning means as including such structure." Nevertheless, the special master recommended denying Seagate's motion for summary judgment of noninfringement with respect to the ST157 family of disk drives. Specifically, he detected unresolved questions of fact regarding equivalence between Seagate's thermal compensation system and the thermal compensation system described in the patent.

Although Judge Gadbois adopted the special master's report in its entirety, he further expounded on the question of whether the "positioning means" invokes § 112, ¶ 6. Relying on Laitram Corp. v. Rexnord, Inc., 939 F.2d 1533, 1536, 19 USPQ2d 1367, 1369 (Fed. Cir. 1991), he noted that a claim element remains subject to means-plus-function rules when the structure recited in the element tells only what the means

does, but not what it is structurally. Applying this rule, the district court decided that the claimed "positioning means" recites what the positioning means includes rather than what it is.

In due course, Judge Letts assumed responsibility for the case. Despite the earlier resolution of the matter by the special master and Judge Gadbois, Judge Letts held a Markman hearing to interpret the "positioning means" element. He decided "it was necessary to readdress [the interpretation of the positioning means] independently because that question might be dispositive of a second issue that had not been addressed: whether the equivalence issue in this case should actually go to a jury." Analyzing the positioning means under § 112, ¶ 6, he concluded that the special master and Judge Gadbois had correctly determined that the corresponding structure included structure for performing thermal compensation. He went further, however, and determined that the patent required the claimed thermal compensation function to be performed solely by the arrangement, geometry, and selection of materials. Under that interpretation, Seagate's drive did not literally infringe because it used additional structure, the thermal pin, to perform thermal compensation. Moreover, Judge Letts opined that the prosecution history estopped Rodime from asserting infringement under the doctrine of equivalents. Thus, he granted Seagate summary judgment that its ST157 drives did not infringe the '383 patent.

On the state law claims, the district court held that Rodime had not stated a cause of action under the requirements of Della Penna v. Toyota Motor Sales U.S.A., Inc., 902 P.2d 740 (Cal. 1995). The district court further held that patent laws would preempt Rodime's cause of action even if it had successfully stated an actionable claim.

Rodime appeals from the district court's judgment on infringement and the state law claims.

After the district court entered judgment in Seagate's favor, Seagate moved for an evidentiary hearing to establish that this case was "exceptional," warranting an award of attorney fees. Seagate based its motion on Rodime's alleged inequitable conduct and abuse of the litigation process. The district court denied Seagate's motion for a hearing and later denied Seagate's motion for attorney fees. In its cross-appeal, Seagate asserts that the district court erred in both of these actions.

## II.

This court reviews a district court's grant of summary judgment by reapplying the standard applicable at the district court. See Conroy v. Reebok Int'l, Ltd., 14 F.3d 1570, 1575, 29 USPQ2d 1373, 1377 (Fed. Cir. 1994). Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In its review, this court draws all reasonable inferences in favor of the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

This court reviews the district court's evidentiary decisions under the law of the regional circuit where appeals from the district court would normally lie. See Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1465, 45 USPQ2d 1545, 1552 (Fed. Cir. 1998). The Ninth Circuit reviews such matters for abuse of discretion. See Williams v. Hughes Helicopters, Inc., 806 F.2d 1387, 1392 (9th Cir. 1986). This court also reviews the district court's decision to deny attorney fees for abuse of discretion.

See Interspiro USA, Inc. v. Figgie Int'l, Inc., 18 F.3d 927, 933-34, 30 USPQ2d 1070, 1074 (Fed. Cir. 1994).

### III.

Determining infringement is a two-step process.  This court first construes the claims, then compares the properly construed claims to the accused device.  See Cybor Corp. v. FAS Tech., Inc., 138 F.3d 1448, 1454, 46 USPQ2d 1169, 1172 (Fed. Cir. 1998) (en banc).  A central issue in this case is the district court's interpretation of the "positioning means" in independent claims 3, 5, and 8.  This court reviews the district court's claim construction without deference.  See Cybor, 138 F.3d at 1456.

Before the district court, Rodime argued that the "positioning means" element did not invoke § 112, ¶ 6 because, although that element contains traditional "means" language, it also recites sufficient structure to take it outside the bounds of that provision.  On appeal, however, Rodime appears to have conceded this threshold issue, devoting its argument instead to the function and corresponding structure implicated by the positioning means.  That concession, however, does not relieve this court of its responsibility to interpret the claims as a matter of law.  To interpret the claims, this court must decide the subsidiary question of whether the claim element disputed by the parties invokes § 112, ¶ 6 in the first instance.  See Personalized Media Communications, Inc. v. International Trade Comm'n, 161 F.3d 696, 702, 48 USPQ2d 1880, 1886 (Fed. Cir. 1998) ("Whether certain claim language invokes 35 U.S.C. § 112, ¶ 6 is an exercise in claim construction and is therefore a question of law . . . .")  Only by undertaking this inquiry can this court ensure consistency in statutory application.  Moreover, this court's claim interpretation affects entities beyond the parties to this

case. Therefore, this court examines the district court's decision that this claim falls under § 112, ¶ 6.

The word "means" is "part of the classic template for functional claim elements." Sage Prods. Inc. v. Devon Indus., Inc., 126 F.3d 1420, 1427, 44 USPQ2d 1103, 1109 (Fed. Cir. 1997). Accordingly, in determining whether a claim element falls within § 112, ¶ 6, this court has presumed an applicant advisedly used the word "means" to invoke the statutory mandates for means-plus-function clauses. See id. Two specific rules, however, overcome this presumption. First, a claim element that uses the word "means" but recites no function corresponding to the means does not invoke § 112, ¶ 6. See id. at 1427. Second, even if the claim element specifies a function, if it also recites sufficient structure or material for performing that function, § 112, ¶ 6 does not apply. See id. at 1427-28 ("[W]here a claim recites a function, but then goes on to elaborate sufficient structure, material, or acts within the claim itself to perform entirely the recited function, the claim is not in means-plus-function format."); Personalized Media, 161 F.3d at 704 ("In deciding whether [the] presumption has been rebutted, the focus remains on whether the claim as properly construed recites sufficiently definite structure to avoid the ambit of § 112, ¶ 6."); Cole v. Kimberly-Clark Corp., 102 F.3d 524, 531, 41 USPQ2d 1001, 1006 (Fed. Cir. 1996) ("An element with such a detailed recitation of structure . . . cannot meet the requirements of [§ 112, ¶ 6].").

In claim 3, the element at issue begins: "positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk ." Claims 5 and 8 use language nearly identical to claim 3, but with the addition of "first and second" before "transducer." Because the element uses the word "means," this

court presumes that § 112, ¶ 6 applies. This court next looks to whether the element specifies a function for performing the claimed means. In making that determination, this court relies primarily on the claim language itself. See York Prods., Inc. v. Central Tractor, 99 F.3d 1568, 1574, 40 USPQ2d 1619, 1624 (Fed. Cir. 1996).

The claim element clearly associates the function of "moving said transducer means between the concentrically adjacent tracks" with the "positioning means." The district court, however, interpreted the element to require more than movement between tracks: "In the disputed claims, the positioning means must not only function to move the head from track to track, it must be able to record data onto a disk and retrieve that data at a later time. Accordingly, the positioning means . . . must be able to accurately locate a track upon which information was recorded at an earlier time." (emphasis added). The district court reasoned that the positioning means could only achieve such "accuracy" with thermal compensation. Thus, according to the district court, thermal compensation must be a function of the claimed means.

In so construing the claims, the district court erred by importing the functions of a working device into these specific claims, rather than reading the claims for their meaning independent of any working embodiment. See Transmatic, Inc. v. Gulton Indus., Inc., 53 F.3d 1270, 1278, 35 USPQ2d 1035, 1041 (Fed. Cir. 1995) ("[T]he district court erred by importing unnecessary functional limitations into the claim."); Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1571, 7 USPQ2d 1057, 1064 (Fed. Cir. 1988) ("Although the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims."). A claim need

not claim every function of a working device.   Rather, a claim may specify improvements in one function without claiming the entire machine with its many functions.

Based on these principles, the district court's strained interpretation of the claimed function cannot stand. The claim language itself clearly states the function of the positioning means:  to move the transducer between tracks on the hard-disk.  The prepositional link "for" ties the "means" to its function.  Later in the same element, the claim reiterates:  "causing said read/write heads to move from one track to the next adjacent track on said micro hard disk."  The claim says nothing about accurate placement of a head within a track.  Nor does it mention thermal compensation in any respect.

The specification underscores the function of movement amongst tracks.   It explains that the "positioning mechanism moves the transducer between the tracks." Col. 3, ll. 45-46 (emphasis added).  Again at col. 3, ll. 53-56, the specification states that the "positioning means moves the transducer along an arcuate path that extends in the radial direction with respect to the disk" so that "the transducer can move between the innermost and outermost tracks on the disk."  Col. 3, ll. 53-56 (emphasis added). These passages emphasize that the function expressly recited in claims 3, 5, and 8 is the claimed function.

To summarize, § 112, ¶ 6 presumptively applies to the "positioning means" in the asserted claims because that element employs traditional "means" language.   In addition, the claim language links the means with a function, namely, moving the transducer between tracks on the hard-disk.  Accordingly, to this point, the claim

element would appear to fall within § 112, ¶ 6. The final step in the analysis, however, requires this court to determine whether the claim nevertheless recites sufficient structure for performing the moving function to take it outside the bounds of that provision.

Following the portion of the claim element quoted above ("positioning means for moving said transducer means between the concentrically adjacent tracks on said micro hard-disk"), claim 3 further provides a list of the structure underlying the means: "said positioning means including: two support arms . . . a pivot shaft . . . a positioning arm . . . a bearing assembly . . . a stepper motor . . . means for operating said stepper motor . . . and a tensioned steel band . . . ." The claim also recites the specific location and interconnection of each of these structural sub-elements. The pivot shaft, for example, has "an axis located on one side of said support arms and spaced away from said support arms." The positioning arm has attached to it "ends of said support arms" and is also "coupled to said pivot shaft." The tensioned steel band couples "said drive shaft of said stepper motor to the other end of said positioning arm." This detailed recitation of structure for performing the moving function takes this claim element out of the scope of § 112, ¶ 6.

The analysis of claims 5 and 8 proceeds similarly. Those claims recite: "positioning means for moving said first and second transducer means between the concentrically adjacent tracks on said micro hard-disks, said positioning means including a positioning arm . . . a pivot shaft . . . four support arms . . . a stepper motor . . . and means for operating said stepper motor." In addition to the recited structure, these claims also recite the interconnection of the structural components and

their location with respect to other elements of the claimed combination. For example, the positioning arm is "disposed within the sealed housing." The pivot shaft is "coupled to one end of said positioning arm" and supports "said positioning arm for rotational movement relative to said micro hard-disks." As with claim 3, this detailed recitation of structure for performing the moving function removes this element from the purview of § 112, ¶ 6.

In reaching the opposite conclusion, the special master seemed concerned that the claim did not recite every last detail of structure disclosed in the specification for performing the claimed moving function. This court's case law, however, does not require such an exhaustive recitation to avoid § 112, ¶ 6. Instead, the claim need only recite "sufficient" structure to perform entirely the claimed function. See Sage, 126 F.3d at 1427-28; Personalized Media, 161 F.3d at 704. Based on the structure disclosed in the specification for performing the moving function, these claims recite nearly all (if not all) of the structural components of the positioning mechanism. In any case, they clearly recite more than sufficient structure for moving the transducer from track to track. Moreover, this case is different from Laitram — relied on by the district court — where the claim element merely recited "some" structure that only "serve[d] to further specify the function of [the] means." 939 F.2d at 1536. Rather, in the words of Laitram, the structure specified in claims 3, 5, and 8 tells what the means "is structurally." Id.

The district court thus erred in interpreting the claims at issue to require the function of thermal compensation and further erred in using § 112, ¶ 6 to read the structure for performing thermal compensation into the claims. As discussed above, the

"positioning means" in claims 3, 5, and 8 does not require the function of thermally compensating and recites sufficient structure to fall outside the limits of § 112, ¶ 6.

On appeal, Seagate argues that the district court correctly interpreted the "positioning means" in claims 3, 5, and 8 to include the thermal compensation function. Moreover, Seagate notes, because the claims do not contain structure for the thermal compensation function, these claims fit within the regime of § 112, ¶ 6. To strengthen this argument, Seagate points to the modifier "positioning" in "positioning means." According to Seagate, "positioning denotes placement beyond mere moving." As noted above, however, the language of claims 3, 5, and 8 do not recite a thermal compensation function at all.

Beyond their claim language, however, the context for claims 3, 5, and 8 within the patent underscores that they do not include a thermal compensation function. For example, the language of claim 11, not asserted in this litigation, supports the reading of claims 3, 5, and 8 to require only a moving function. Claim 11 recites: "positioning means for moving said transducer means between the tracks on said hard-disk, said positioning means being formed of selected materials for compensating for any mispositioning arising from thermal effects . . . ." (emphasis added). Thus, the "positioning means" claimed in claim 11, unlike those in claims 3, 5, and 8, explicitly adds the function of "compensating for any mispositioning arising from thermal effects." In other words, the narrower claim 11 adds a thermal compensation function expressly not included in the broader claims 3, 5, and 8. Had Rodime intended or desired to claim thermal compensation as a function of the positioning means in the asserted claims, it could have done it explicitly, as in claim 11. The absence of any such explicit

language, however, shows that claims 3, 5, and 8 do not include the function of thermal compensation.

Any difficulty in identifying the function performed by the claimed means apparently stems from the description of the preferred embodiment of the positioning mechanism, which has thermal compensation built into it. As the specification explains: "By appropriately selecting materials of different coefficients of thermal expansion for the various components of the positioning mechanism, it is possible to provide thermal compensation so as to ensure that the read/write heads remain on track irrespective of thermal effects." Col. 8, ll. 22-27. This passage, however, merely highlights the unremarkable fact that a particular means may perform more than one function. It does not follow, however, that the positioning means in claims 3, 5, and 8 necessarily performs both these functions. See Velo-Bind, Inc. v. Minnesota Mining & Mfg. Co., 647 F.2d 965, 968-69, 211 USPQ 926, 929 (9th Cir. 1981) (declining to interpret "cutting means" to include a binding function merely because the specification disclosed a hot knife that performed both cutting and binding). Indeed, the two functions are not inextricably intertwined. Rather, the specification associates separate structure with each separate function. The specification teaches one of ordinary skill in this art to construct and use a positioning mechanism to move the transducer heads from track to track without "appropriately selecting materials of different coefficients of thermal expansion." While such a construction would not compensate for thermal effects, it would nevertheless operate to move the read/write heads from track to track. In other words, thermal compensation is an additional function, with separate, additional structure, included within this patent as a separate claimed feature within the broader

parameters of the entire claimed invention.  Each claim, however, need not carry the limitations of narrower, specific claimed features.  The specification makes this distinction and supports the interpretation of this language of claims 3, 5, and 8 which recite only the function of movement between tracks.

Finally, the prosecution history of these claims also supports the express claim language.  During reexamination, the examiner rejected claim 11 — which specifically recites thermal compensation as a function of the positioning means — based on European Patent Application No. 0,055,568.  That reference describes a thermal compensation system in a prior Rodime hard-disk.  Responding to that rejection, Rodime distinguished its claimed thermal compensation structure from the prior art. The examiner, recognizing the additional function in narrower claim 11, cited no thermal compensation art against claims 3, 5, and 8, nor did Rodime raise thermal compensation at all in relation to those claims.  This prosecution history accords with this interpretation of the language of the claims.  The claim language does not recite any thermal compensation function in claims 3, 5, and 8 and the examiner understood that interpretation.  In addition to the claim language, this prosecution history also served to notify the public of differences between the narrower functions of claim 11 and the broader functions of claims 3, 5, and 8.

In sum, claims 3, 5, and 8 do not warrant interpretation under § 112, ¶ 6 because they recite sufficient structure to perform the entire claimed function.  By applying § 112, ¶ 6 to these claims, the trial court mistakenly read limitations from the specification into the claims.  Properly interpreted, the asserted claims do not require thermal compensation.  Because the district court granted summary judgment of

noninfringement on grounds relating only to the particular thermal compensation scheme used in Seagate's drives, this court vacates that judgment and remands for further proceedings to determine whether Seagate has infringed the claims.

## IV.

### State Law Claims

Rodime also appeals from the district court's grant of summary judgment that Seagate is not liable for tortious interference with Rodime's prospective economic advantage or for unfair competition. The district court held that Rodime did not allege facts sufficient to state a cause of action under Della Penna and, even if the facts were sufficient, the patent laws preempted Rodime's claims.

As a preliminary matter, the patent laws do not preempt Rodime's state law claims. Rodime based its claims on Seagate's alleged efforts to dissuade other disk drive companies from taking a license from Rodime. The patent laws will not preempt such claims if they include additional elements not found in the federal patent law cause of action and if they are not an impermissible attempt to offer patent-like protection to subject matter addressed by federal law. See Dow Chem. Co. v. Exxon Corp., 139 F.3d 1470, 1473, 46 USPQ2d 1120, 1123 (Fed. Cir. 1998). Seagate alleges that Rodime's causes of action implicate the patent law cause of action of inducement to infringe.

To the contrary, the elements of proof for inducement are markedly different from those for tortious interference and unfair competition. Inducement requires proof that the accused infringer knowingly aided and abetted another's direct infringement of the patent. See Water Tech. Corp. v. Calco, Ltd., 850 F.2d 660, 668, 7 USPQ2d 1097,

1103 (Fed. Cir. 1988). Tortious interference, in contrast, requires proof that the defendant intentionally engaged in acts wrongful by some measure other than the fact of the interference itself which are designed to disrupt an economic relationship between the plaintiff and another. See Della Penna, 902 P.2d at 743 n.1, 751. Inducement requires no proof that the acts underlying the inducement are "wrongful" by some measure other than the fact of the inducement itself.

As to unfair competition, Rodime must prove that Seagate engaged in an unfair business practice, that is, a business practice that is immoral, unethical, oppressive, unscrupulous, or substantially injurious. See People v. Casa Blanca Convalescent Homes, Inc., 206 Cal. Rptr. 164, 177 (Cal. Ct. App. 1984). Inducement, in contrast, requires no such proof that the alleged infringer's business practice is immoral, oppressive, or the like.

Thus, these state law causes of action require proof of additional elements not found in the patent law cause of action. Moreover, this court finds that these state law causes of action do not constitute an impermissible attempt to offer patent-like protection to subject matter addressed by federal law. Tortious interference protects business relationships. Unfair competition prevents unethical and oppressive business practices. Neither of these regimes purport to extend protection to the classes of invention protected by Title 35. See 35 U.S.C. § 101 (1994). Because these state law causes of action protect interests different from federal patent law, federal law does not preempt Rodime's state law claims.

The district court also held that Rodime did not state a cause of action under the requirements of Della Penna, which modified the elements of proof necessary to

98-1076, 98-1112,-1204                    21

establish tortious interference with prospective economic relations. At the outset, Della Penna deals only with the tort of interference with prospective economic relations and is silent about the tort of unfair competition. Accordingly, the district court erred in dismissing Rodime's unfair competition claim because it did not satisfy the requirements of Della Penna. As to tortious interference, Della Penna requires, in pertinent part, proof that a defendant intentionally engaged in wrongful acts or conduct designed to interfere with or disrupt an economic relationship between plaintiff and another. See Della Penna, 902 P.2d at 743 n.1, 751. Della Penna specifies that the acts or conduct must be wrongful "by some legal measure other than the fact of interference itself." Id. at 751. Viewing the facts most favorably to Rodime, this court finds a genuine issue of material fact in dispute, namely, whether Seagate's activities were wrongful by some legal measure other than the fact of interference itself. This dispute of material fact precludes summary judgment.

Viewed in a light most favorable to Rodime, Rodime has presented evidence showing the chain of events discussed at the outset of this opinion. This court also finds relevant Mr. Talsoe's letter to the Department of Commerce offering his consulting services in which he indicated that he had "left Seagate" even though he was still receiving salary and benefits from Seagate. Seagate's attorneys, having assisted in drafting the letter, were apparently aware of the misrepresentation, but made no attempt to correct it.

These activities suffice to establish a disputed issue of fact as to the wrongfulness of Seagate's conduct. Seagate's contacts with Rodime's potential licensees, as well as the meetings organized by Seagate, for example, give rise to an

inference that Seagate's activity was anti-competitive and may have violated the antitrust laws. In addition, the misleading, if not outright false, statements made by Mr. Talsoe and Seagate to the PTO similarly raise a genuine issue of fact about the wrongfulness of Seagate's conduct. <u>See</u> 18 U.S.C. § 1001 (1994) (false representations to a government agency grounds for fine and imprisonment); 37 C.F.R. § 10.23 (1996) ("A practitioner shall not . . . engage in conduct involving dishonesty, fraud, deceit, or misrepresentation," including "giving false or misleading information" to the PTO).

Seagate contends that the <u>Noerr-Pennington</u> doctrine protects its meetings with others for the purpose of petitioning the PTO. That doctrine immunizes, under the First Amendment, solicitation of governmental action even though the sole purpose of the solicitation is to restrain competition. Seagate's contention fails for two reasons. First, <u>Noerr-Pennington</u> does not protect conduct which is otherwise unlawful. <u>See</u> <u>Federal Trade Comm'n v. Superior Court Trial Lawyers Ass'n</u>, 493 U.S. 411 (1990). As just noted, there is a genuine issue of fact as to whether Seagate's conduct was otherwise unlawful. Even assuming that <u>Noerr-Pennington</u> immunity applies, however, it would only protect Seagate's efforts to petition the government. Before the form factor meetings, Seagate's contacts with Rodime's potential licensees, again construed most favorably to Rodime, had nothing to do with petitioning the government.

Accordingly, this court vacates the district court's order granting summary judgment on Rodime's state law claims and remands for a trial on the merits.

## V.

### Consequential Business Damages

During the course of the litigation, Rodime elected to forego lost profits as a measure of damages in favor of reasonable royalties. As part of its reasonable royalty case, however, Rodime wished to prove certain so-called "consequential business damages." Specifically, Rodime alleges that Seagate's refusal to take a license under the '383 patent deprived Rodime of an income stream sufficient to enable it to have survived and profited as a disk-drive manufacturer, forcing it to instead declare bankruptcy. According to the report of Rodime's damages expert:  "A reasonable estimate of this additional damage through June 1993 is in the range of $58 to $107 million, over and above the royalty revenues." (emphasis added). Seagate success- fully moved to exclude this evidence because such damages are not relevant to the calculation of a reasonable royalty. Rodime appeals the exclusion.

Rodime's position has some superficial appeal. The foundation of a reasonable royalty analysis is a hypothetical negotiation between the patentee and the accused infringer at the time the infringement began. See Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554, 35 USPQ2d 1065, 1076-77 (Fed. Cir. 1995) (en banc). The condition of Rodime's business at the time of such a hypothetical negotiation with Seagate may have affected the outcome of those negotiations. If, for example, Rodime faced imminent bankruptcy (as borne out by later events), Rodime may have factored that consideration into the royalty it sought. In that sense, Rodime's evidence would seem to be relevant to its reasonable royalty case.

Rodime, however, does not seek to inform the circumstances of the hypothetical negotiation as part of its computation of a reasonable royalty. Instead, Rodime seeks to recover additional damages — those flowing from Seagate's refusal to take a license — above and beyond a reasonable royalty. This court discerns no abuse of discretion by the district court in excluding the evidence for that purpose. The "consequential damages" Rodime seeks are merely a species of lost profits. Having elected to pursue only a reasonable royalty, Rodime cannot, in the district court's words, "bootstrap evidence of its lost profits back into the case by reference to 'reasonable royalties.'" Accordingly, this court affirms the district court's grant of Seagate's motion in limine to exclude evidence of Rodime's consequential business damages.

## VI.

### Attorney Fees

Seagate cross-appeals the district court's denial of its motion for attorney fees based on Rodime's alleged inequitable conduct in securing the '383 patent and on Rodime's alleged abuse of the litigation process. Seagate faults the district court for summarily denying attorney fees without entering findings as to exceptional case. Because this court vacates the district court's judgment of noninfringement, Seagate is no longer a "prevailing party" under 35 U.S.C. § 285 (1994). Accordingly, Seagate is not entitled to a finding of exceptional case or to an award of attorney fees.

## VII.

For the foregoing reasons, judgment of the district court is vacated-in-part, affirmed-in-part, and remanded. This court vacates the judgment of noninfringement

and the judgment of no liability for Rodime's state law claims, affirms the exclusion of

Rodime's consequential business damages, and remands for further proceedings

## COSTS

Each party shall bear its own costs.

### VACATED-IN-PART, AFFIRMED-IN-PART, AND REMANDED.

Not Reported in F.Supp.
44 U.S.P.Q.2d 1627
(Cite as: 1997 WL 813016 (C.D.Cal.))

Page 1

►

**RODIME PLC, A SCOTTISH COMPANY,
Plaintiff,
v.
SEAGATE TECHNOLOGY, INC., A Delaware
Corporation, Defendant.**

**No. CV92-6855JSL.**

United States District Court, C.D. California.

July 3, 1997.

ORDER AND JUDGMENT RE MARKMAN
CLAIM INTERPRETATION HEARING

LETTS, District J.

*1 On February 25 and 26, 1997, this Court conducted a Markman hearing to resolve the claim construction issues in this action. Having reviewed the papers submitted regarding this matter, having heard the evidence and oral argument presented at the Markman hearing, and being fully apprised of the relevant facts and law, IT IS HEREBY ORDERED AND ADJUDGED that

1. The positioning means elements of claims 3, 5, 8, and 17 of Rodime's '383 patent require thermal compensation.

2. The positioning means of claims 3, 5, 8, and 17 of Rodime's '383 patent provides thermal compensation solely by arrangement, geometry, and selection of materials.

3. The Seagate ST157 positioning mechanism does not literally infringe claims 3, 5, 8, and 17 because it uses a separate member for thermal compensation.

4. The Seagate ST157 positioning mechanism does not infringe claims 3, 5, 8, and 17 under the doctrine of equivalents or under § 112, ¶ 6 because it uses a separate member for thermal compensation.

IT IS FURTHER HEREBY ORDERED AND ADJUDGED that summary judgement be entered in favor of Seagate, provided that, however, the Court will proceed with an advisory jury trial if either party so requests.

Discussion

The primary claim construction issue before the Court at the Markman hearing was whether the positioning means element of claims 3, 5, 8, and 17 of Rodime's '383 patent required thermal compensation. Although this question had been previously been answered by Special Master Wardlaw and Judge Gadbois, the Court decided it was necessary to readdress it independently because that question might be dispositive of a second issue that had not been addressed: whether the equivalence issue in this case should actually go to a jury.

The Court concurs with and adopts the conclusions reached by Judge Gadbois, Special Master, and court-appointed expert Professor Bogy, that thermal compensation has to be included in the positioning means element of the disputed claims. Markman Hearing Exhibits, Exhibit 7, p. 3--6 (Bogy); Exhibit 39, p. 9 (Wardlaw); Exhibit 40, p. 3--4 (Gadbois).

The Court's independent analysis focused primarily on the previously undiscussed issue of whether the "positioning means" element could be sub-divided into two separate and distinct functions: the function of "moving" the head from track to track, and the function of thermal compensation. This simplistic statement of the issue suggested a simple answer: movement from track to track takes place in a period of time so brief that thermal compensation is not required for accurate movement. Consequently, thermal compensation could be defined as a distinct function from the function of moving from track to track. Markman Hearing Transcript, 2/25/97, at 63, 77 (Bogy), and 126 (Kline).

However, this narrow definition of moving is not a complete definition of the "moving" that is required of a computer disk drive system. In defining the function of a means plus function claim, the Court must define the function in terms that are relevant to the invention described in the specification. See Markman v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed.Cir.1995). In the disputed claims, the positioning means must not only function to move the head from track to track, it must be able to record data onto a disk and retrieve that data at a later time. Accordingly, the positioning means of a disk drive system must be able to accurately locate a track upon which information was recorded at an earlier time.

*2 The Court agrees with Professor Bogy that in order to accomplish this "moving" function thermal

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
(Cite as: 1997 WL 813016, *2 (C.D.Cal.))

compensation is required. Transcript of Proceedings, 3/6/97, at 9--10. Without thermal compensation, the disk drive system would not be able to read data recorded previously at a different temperature. Since "moving" in the context of the disputed claims necessarily includes returning to tracks of previously recorded information, the fact that each required movement takes place in only a short period of time does not make the function of movement separable from that of thermal compensation.

Rodime argues that the functions are nonetheless separable because the claimed invention can accomplish the relevant moving function without thermal compensation, so long as there are no significant changes in temperature between the time data is recorded and retrieved. [FN1] This would require that the invention only be operated 1) in a temperature-controlled environment and 2) after a "warm up" period. [FN2] This contention is not supported by the patent.

> FN1. Alternatively, Rodime argues that thermal compensation, even if necessary for the invention, is a trivial aspect of a disk drive system and need not be included in the disputed claims. However, on re-examination, Rodime distinguished the claimed invention over prior art based on the means for providing thermal compensation of its invention. Markman Hearing Exhibits, Exhibit 4(D) at L004253--L004255. The argument that the means for providing thermal compensation made its claimed combination novel over the prior art, estops Rodime from arguing before this Court that thermal compensation, although necessary, is a trivial aspect of a disk drive system that is not, and need not, be included in the disputed claims.

> FN2. Uncontradicted evidence presented at the Markman hearing established that, at least during a "warm up period," there are temperature changes created by the operation of the disk drive system itself that would require thermal compensation. Markman Hearing Transcript, 2/25/97, at 121 (Kline) and 129 (Bogy).

Nowhere in the patent, or any of the evidence examined by the Court, does it indicate that the disk drive system should only be used after delay or in a climate controlled environment. See, Markman Hearing Transcript, 2/25/97 at 57. [FN3] On the contrary, the patent indicates that the disk drive system would not have such limitations. The patent repeatedly states that the invention is "particularly suited to meet the demands of a portable computer system" and other uses "where compact, rugged light-weight hard-disk storage is required." See, e.g., Markman Hearing Exhibits, Exhibit 1, '383 patent at Abstract; 1:38-49; 2:37-43 (object of the invention); 3:9-28; 5:11-15; 5:9-15; 5:34-39. These uses are not achievable with a disk drive system that must only be operated in a temperature-controlled room after a delay period. The value of portability is the ability to transport and use computers in multiple locations, which will inevitably have varying temperatures.

> FN3. 35 U.S.C. § 112, ¶ 1 mandates: " The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise and exact terms as to enable any person skilled in the art to which it certains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention."

Further, if the disputed claims were construed to have these limitations they would not represent an advancement of the prior art, and may deprive the patented invention of any commercial use. The practical significance, in 1987, of a computer that could only be used in a temperature-controlled environment is doubtful. As indicated by the patent itself, such an invention would have been a step backwards in the development of computers, rather than a step forward toward compactness and portability. [FN4]

> FN4. See also, Markman Hearing Transcript, p. 130 (Kline) ("...clearly in the early conditions of manufacturing of disk drives, we imposed that they had to be in a controlled environment and they have to be operated exactly in that fashion.")

Having construed the positioning means element of the disputed claims as including thermal compensation, the Court concludes that the patent discloses and protects only positioning means that provide thermal compensation solely by arrangement, geometry, and section of materials. The Seagate ST157 positioning mechanism does not infringe these claims because it uses a "separate member" to accomplish thermal compensation.

*3 Although the issue of infringement under the doctrine of equivalence or under § 122 ¶ 6 presents a jury question, the Court can determine the issue under the general summary judgment standard when

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                                           Page 3
(Cite as: 1997 WL 813016, *3 (C.D.Cal.))

there is no genuine issue of material fact. Warner-Jenkinson Co. v. Hilton Davis Chem. Co., --- U.S. ----, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). [FN5] In this action, there is not a genuine issue of material fact as to infringement.

> FN5. "Where the evidence is such that no reasonable jury could determine two elements to be equivalent, district courts are obliged to grant partial or complete summary judgment. [citations omitted]. If there has been a reluctance to do so by some courts due to unfamiliarity with the subject matter, we are confident that the Federal Circuit can remedy the problem. Of course, the various legal limitations on the application of the doctrine of equivalents are to be determined by the court, either on a pre-trial motion for partial summary judgment or a motion for judgment as a matter of law at the close of the evidence and after the jury verdict. [citations omitted]. Thus, under the particular facts of a case, if prosecution history estoppel would apply or if a theory of equivalence would entirely vitiate a particular claim element, partial or complete judgment should be rendered by the court, as there would be no further material issues for the jury to resolve." Id., at n. 8.

The Court agrees with Professor Bogy that, based on two distinct lines of analysis, Seagate's ST 157 does not infringe the Rodime '383 patent under the doctrine of equivalence or under § 112, ¶ 6. Markman Hearing Exhibits, Exhibit 7, Report of Professor Bogy at 2, 15--27. First, Rodime is estopped from claiming equivalence by its arguments distinguishing prior art during re- examination. Second, limiting the equivalents to exclude systems that have a separate member for thermal compensation is the only construction consistent with the patent's validity.

Rodime is estopped from claiming equivalence by its arguments distinguishing prior art during re-examination. The prosecution history "is of primary significance in understanding the claims." Markman v. Westview Instruments, Inc., 52 F.3d 967, 980 (Fed.Cir.1995), aff'd 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); Alpex Computer Corp. v. Nintnedo Co., 102 F.3d 1214, 1220 (Fed.Cir.1996). If an applicant specifically distinguishes a structure from what is claimed during prosecution, the applicant will be estopped from asserting a scope for the same claim that covers the structure. Alpex Computer Corp. v. Nintendo Co. Ltd., 102 F.3d 1214, 1221--22 (Fed.Cir.1996). Just as prosecution history may act to estop an equivalence argument under the doctrine of equivalents, positions taken

before the PTO may bar an inconsistent position on claim construction under § 112, ¶ 6. Id.

In reexamination of the '383 patent, Rodime's attorneys distinguished the thermal compensation of the '383 patent from that of the Kaseta '996 patent. Markman Hearing Exhibits, Exhibit 4(D) at L0004254. [FN6] Rodime's attorneys admitted that the use of metallurgy to compensate for thermal effects was known in the art, but distinguished the Kaseta patent based on the fact that it used a "separate member," as opposed to relying solely on arrangement, geometry, and section of materials, to accomplish thermal compensation. [FN7]

> FN6. Although this discussion was related to claim 11, this discussion is relevant to the disputed claims because the "positioning means" of those claims requires thermal compensation, and only one kind of thermal compensation is revealed in the specification: one that accomplishes thermal compensation solely by arrangement, geometry, and selection of materials. See supra.

> FN7. The court-appointed and party experts have considered at length the issue of how the Kaseta spring actually works to accomplish thermal compensation. See Markman Hearing Exhibits, Exhibit 7, Report of Professor Bogy at 22--25. The Court agrees with Professor Bogy that regardless of how the spring in Kaseta works, Rodime considered it a "separate member" from materials and geometry, and distinguished its claimed combination on that basis before the PTO. See Markman Hearing Exhibits, Exhibit 7, Report of Professor Bogy at 24.

In so doing, Rodime is estopped from asserting that the scope of its claims cover a structure that accomplishes thermal compensation through a separate member. The "thermal pin" of Seagate's ST157 design is a "separate member" similar to the thermal biasing spring element of the Kaseta patent. Markman Hearing Exhibits, Exhibit 7, Report of Professor Bogy at 15--25. Therefore, the Court agrees with Professor Bogy that Rodime is estopped from claiming that such a structure is an equivalent. Id. at 26--27.

Even if, arguendo, Rodime is not deemed to be estopped by its arguments, limiting the scope of equivalents to exclude systems with thermal compensation relying on a "separate member" is the only construction consistent with the patent's validity. The Court, the court-appointed experts, and the Special Master in this action have repeatedly raised

Not Reported in F.Supp.
(Cite as: 1997 WL 813016, *3 (C.D.Cal.))

Page 4

concerns that, in light of the inherent commonality of methods for making computers smaller, call into question the validity of the '383 patent. See, e.g., Transcript of Proceedings, 3/6/97, p. 6; Markman Hearing Transcript, 2/25/97, p. 66--67. The Court agrees with Professor Bogy that the Rodime '383 patent would have been obvious in light of the prior art but for its unique method for achieving thermal compensation, and its distinction and disavowal of combinations that achieved thermal compensation through a separate member. See Markman Hearing Exhibits, Exhibit 6 at 1.

**4** Therefore, the scope of the '383 patent under the doctrine of equivalents and § 112, ¶ 6 is quite narrow. "The broadest protection under the doctrine of equivalents is reserved for pioneer or generic patents... as distinguished from a mere improvement or mere perfection of what had gone before." 3 Peter D. Rosenberg, Patent Law Fundamentals § 1707[1] at 17-95. Even if the test for equivalence is met, "there can be no infringement if the asserted scope of equivalency of what is literally claimed would encompass prior art." Id. at 17-90.1.

When questioned by the Court at the Markman hearing, Professor Bogy stated if Seagate has attempted to patent its ST157 design prior to Rodime, it would have been obvious in light of the teaching of Kaseta. If the scope of the Rodime '393 disputed claims covered thermal compensation structures that included a separate member, they would have been obvious in light of the teaching of Kaseta as well. See Markman Hearing Transcript, 2/25/97, at 105-107. Even without Kaseta, the use of a separate member for thermal compensation would have been obvious to those skilled in the art when the patent was prosecuted. Id. at 107.

Rodime obtained the patent by construing its claims narrowly, as not covering structures that used a separate member to accomplish thermal compensation. It was necessary for Rodime to make this narrow construction to obtain the '383 patent. The Court will not adopt a construction of the scope of the disputed claims pursuant to the doctrine of equivalents or § 112, ¶ 6 that would render them obvious and invalid.

IT IS SO ORDERED.

END OF DOCUMENT

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works